UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMMANUEL ISONG,

        Plaintiff,

v.

GENERAL MOTORS CORP.,

        Defendant.

                           /

Case No. 04-72614

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23]**

This employment discrimination matter comes before the Court on Defendant General Motors Corporation ("GM")'s motion for summary judgment. Plaintiff's complaint alleges a claim of race discrimination in violation of Title VII, 42 U.S.C. §§ 2000e-5, *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, *et seq.* For the reasons stated below, Defendant's motion is GRANTED.

**I.   Facts**

**A.  CGIT Program**

Plaintiff was employed by GM from April 2, 2001 until August 9, 2001 at the General Motors Technical Center in Warren, Michigan. (Compl. ¶ 6.) He was hired as an associate engineer in GM's College Graduates In Training ("CGIT") Program. This is a two-year program that trains participants in design, product, and manufacturing engineering. (Def.'s Ex. 1, CGIT program description.) The first year of the CGIT program consists of four, three-month rotations in mandatory assignments, beginning with the Design/Unigraphics

assignment.  (Def.'s Ex. 2, CGIT rotational plan.)  Thus, as part of his required CGIT training, Plaintiff would be enrolled in a Unigraphics ("UG") course.

Unigraphics is the mathematical modeling computer program used by GM's engineers and designers to create and design products.  (Def.'s Ex. 3, Lange Aff. ¶ 3.)  UG is available in both a three week and a six week course.  UG training courses are designed to make sure that students reach a required level of UG proficiency.  (Def.'s Ex. 7, Korzeniewski Aff. ¶ 2.) GM prefers that CGIT trainees successfully complete the Design/Unigraphics training as part of their first training rotation because subsequent on-the-job training relies upon UG knowledge.  (Lange Aff. ¶ 4.)

During the two-year CGIT program, trainees are assigned a mentor to advise and assist them because they do not report to supervisors during training rotations.  (Def.'s Ex. 4, Mandernack Aff. ¶ 2.)  Daniel Mandernack, Engineering Group Manager, was Plaintiff's mentor during his participation in the CGIT Program.  (*Id.* at ¶ 4.)

**B.  Plaintiff's Participation in the Three Week UG Course**

In April 2001, Plaintiff participated in a three week UG course.  It was taught by three instructors, each of whom worked with and closely observed Plaintiff's classroom activities and work product.  The primary instructors were Doug Payne and Joe Jacob.  (Def.'s Ex. 5, Payne Aff. ¶ 3; Ex. 6, Jacob Aff. ¶ 3.)  Diane Korzeniewski also filled in as an instructor at times.  (Def.'s Ex. 7, Korzeniewski Aff. ¶ 4.)

By April 5, 2001, Plaintiff had already been in contact with the CGIT Program supervisor, notifying her that he was having trouble keeping up in the UG training class. (Def.'s Ex. 8, Carlson e-mail.)  Contrary to the computer experience listed on his resume (Def.'s Ex. 9), Plaintiff's instructors noted that "it did not appear that Mr. Isong had ever

2

been exposed to computers prior to the UG class", and that he "lacked the basic computer skills needed to become Unigraphics certified." (Korzeniewski Aff. ¶ 5; Jacob Aff. ¶¶ 5. 8; Payne Aff. ¶ 6.) They observed that Plaintiff "struggled considerably" in the three week UG training course and found his performance to be "horrible." (Payne Aff. ¶ 4; Ex. 27, e-mail.) It was noted that he often failed to complete assignments or took an extremely long time to complete them. (Jacob Aff. ¶ 7; Exs. 28 and 29, e-mails.) The instructors observed that Plaintiff was unable to navigate basic file structures, and at various times, could not complete simple assignments in their presence. (Payne Aff. ¶ 4; Korzeniewski Aff. ¶ 6.) One instructor strongly suggested that Plaintiff repeat the three week UG class "once his PC skills are up to speed." (Def.'s Ex. 11, e-mail to D. Mandernack; Korzeniewski Aff. ¶ 7.)

Despite their efforts to help Plaintiff become proficient in Unigraphics, Plaintiff was unable to do so. (Payne Aff. ¶ 5; Korzeniewski Aff. ¶ 11.) Plaintiff's instructors felt that part of his performance difficulties could be attributed to the fact he was often late for class, took extended lunch hours, and frequently made cell phone calls during class. (Payne Aff. ¶ 5; Jacob Aff. ¶ 4; Korzeniewski Aff. ¶ 10; Exs. 28 and 29, e-mails.) Plaintiff did not pass the three week Unigraphics class in April 2001. (Lange Aff. ¶ 5; Payne Aff. ¶ 6; Jacob Aff. ¶ 8; Korzeniewski Aff. ¶ 7.)

## C.  Plaintiff's Participation in the Six Week UG Course

On April 26, 2001, GM notified Plaintiff that, although he was "deficient in some of the basic computer skills need to become Unigraphics Certified" and it was "standard protocol" for all CGIT program participants to be Unigraphics Certified "as a condition of continued employment", GM had decided to give Plaintiff "the opportunity to take an additional six-

3

week Basic Unigraphics course." (Def.'s Ex. 12, 4/26/01 letter agreement.)   GM also warned Plaintiff that if he did not successfully complete the class, his employment status would be "re-evaluated to determine your continued employment." (*Id.*) Plaintiff signed this letter agreement and understood that he had to pass the UG course to continue in the CGIT Program. (*Id.*; Def.'s Ex. 13, Pl.'s Dep. at 144-45.)

The six-week Basic Unigraphics course began on May 21, 2001 and ended on June 29, 2001. (Def.'s Ex. 31.) This six-week course covers much of the same material from the three-week course but at a slower pace and goes into greater detail on file navigation and other basics that CGITs should already be fluent in. (Korzeniewski Aff. ¶ 8.) This six-week UG course does not use objective test scores to rate student progress. While there are written assessments after each module requiring 70% or more to pass that module, these do not determine whether a student will pass or fail the six-week UG course. Rather, it is based on proficiency demonstrated through projects completed in a timely manner. (Korzeniewski Aff. ¶ 14.)

For the first two weeks, Diane Korzeniewski was the instructor of this UG course. When she went out on medical leave, she was replaced by Doug Payne. During the time that Ms. Korzeniewski was the instructor, she observed Plaintiff struggling with the material. (Korzeniewski Aff. ¶¶ 11; Ex. 29, e-mail.) She spent a considerable amount of extra time with Plaintiff (1 to 2 hours each day beyond the 8-hour scheduled class time) to help him. This was unprecedented in her three years as a UG instructor. She also gave him extra help during the regular 8-hour class session, taking time away from other students. (Korzeniewski Aff. ¶ 12.)   Because Plaintiff continued his previous pattern of coming to

class late, Ms. Korzeniewski had to talk to him about it twice.  This attendance behavior was not common in other CGIT trainees.  (*Id.* at ¶ 10.)

Despite the extra help, Ms. Korzeniewski observed that Plaintiff took an extraordinary amount of time to complete assignments as compared to the other CGIT trainees. (Korzeniewski Aff. ¶ 12; Ex. 29.)  She assessed his performance as "shaky" at best. (Korzeniewski Aff. ¶ 15.)  She found him to be a "high maintenance" student, requiring lots of "hand holding" and still he often completed assignments days late.  (*Id.* at ¶ 15.)

After Doug Payne replaced Ms. Korzeniewski as instructor of the six-week UG course, he observed that Plaintiff displayed the same deficiencies that were evident in his performance in the three-week UG course; i.e., the inability to complete simple assignments and a lack of proficiency in using the Unigraphics computer program.  (Payne Aff. ¶ 8.)  Based on his personal observations of Plaintiff's classroom performance, Mr. Payne concluded that Plaintiff did not successfully complete the six-week course and should not be UG certified.  (Payne Aff. ¶¶ 8, 9; Ex. 30.)  He communicated his observations and assessment of Plaintiff's performance to Diane Lange, Manager of Technical Training at GM's Knowledge Center in Warren, Michigan.  (Payne Aff. ¶ 8.)

Based on each of his instructors' observations of his classroom performance, it was determined that Plaintiff had not successfully completed the six-week UG course and had not obtained the necessary level of proficiency required for CGITs.  (Ex. 14, e-mail; Payne Aff. ¶ 9; Lange Aff. ¶¶ 6, 7.)

**D.  Unigraphics Skills Assessment Test**

On July 16, 2001, in a closed door meeting with Plaintiff and several of the instructors from the two UG classes Plaintiff took, Ms. Lange, GM's Technical Training Manager, told

Plaintiff that he had failed to pass the skills assessment administered at the end of the second Unigraphics course.  She further informed him that it appeared he did not have the skills necessary to use the UG computer program.  (Lange Aff. ¶ 9.)

Plaintiff disputed the assessment of the four Unigraphics instructors who determined that he lacked the requisite proficiency in the UG computer program to become certified. He showed his mentor, Mr. Mandernack, what he claimed was his final exam for the six-week course as evidence of successful completion.  Mr. Mandernack could not verify whether this was indeed a final exam.  (Mandernack Aff. ¶ 8.)  Plaintiff testified that when he and all the other students in the six-week course completed a second final test, Mario Crucion, another GM instructor, told them they all passed the course.  He "shook hand [sic] with all of us; say [sic] 'Everybody passed.'  We call [sic] up the drawings, he looked through.  No problem.  He gave us his business card."  (Pl.'s Dep. at 313-14.)  Plaintiff further testified that the next morning Mr. Payne came in and told everyone they passed the course but later told Plaintiff that he did not.   Plaintiff explains:

> Then the next morning Mr. Payne came up, asked us to call up a drawing.
> He looked through it.  He said "Everybody passed."
>
> Then he gave us papers to sign the way we want our name to be written on
> the certificate.
>
> * * *
>
> Then I went to his office.  Because I was trying to let him know that I could
> not go to the lunch with him.  Because I have to meet another instructor.
> Since that was the day we were going to shut down.
>
> So when I went to ask him to give my certificate to me before I go, he said he
> was not going to give it to me.
>
> Q:  Did he tell you why?

A:  He said he did -- according to him -- he swore -- he said that he's not sure
that I could navigate files, and I could pick drawing and draw something and
put it back.

I say "If you were not sure, how then did I -- did I finish this -- one, two -- if
you are not sure, how did I pass test 1, test 2, test 3, test 4, test 5 and test
6, then this final?"

Because this takes a lot of operations, this –

Q:  What did he say to you in response?

A:  Nothing.

(Pl.'s Dep. at 313-15.)   Without the certificate, Plaintiff knew he would ultimately be

terminated.  (*Id.* at 315.)

   After learning that he would not get his UG certification, Plaintiff first contacted Mario

Crucion and then his mentor, Dan Mandernack:

A:  Yeah.  Because what happened is, after I was refused -- after I refused
to -- they refused to give me certification, then I called Mario.  Because he
was the one who gave us the final.

Q:  Just go ahead.  Go on.

A:  And I called Mario, and asked Mario that "What happened?"  You say my
design and you said that I passed.  What happened?

Then Mario hung up the phone on me and said he was not going to talk to
me.  So that was when I went ahead and called Mr. Mandernack.

And Mr. Mandernack asked me was there any issue at all that existed in this
class.  I said there were, as far as I know, other than them not answering
questions, that I was -- everything that was done in class I did.  And all my
files, I did.

Then that was when Mr. Mandernack asked me to see him in three weeks.
That is when we come back from the break.

So when we came back from the break and I went and saw him, then -- and
he asked me to -- to open my drawing files so that he can look at it.  Then I
opened my drawing files, with all the files.  And he said okay, that he does

not understand -- I pull up the drawing, pull up the final, pull up -- he said "Oh, did you do all this?"

I said "Yes."

He said "Okay."  That I should try and protect it, one.  He asked me if I can print them out.

* * *

Q:  Okay.  Now, during this conversation, did you specifically tell Mr. Mandernack that the failure to give you the manuals and the failure to give you certification was discrimination against you on the basis of your race? Yes or no?

A:  Yes, I did.

Q: Okay.  What did you ask Mr. Mandernack to do to resolve your complaints at that point in time?

A:  I asked him to . . . .

* * *

A:  To find out from -- to try to get manuals to me.

(Pl.'s Dep. at 332-33.)  Plaintiff also asked Mr. Mandernack to have an independent person review his UG test.  (Pl.'s Dep. at 336.)

Because he disputed his UG instructors' assessment of his lack of proficiency, Julie Piziali, a GM Human Resources Representative, arranged for Plaintiff to take the Unigraphics Skills Assessment (UGSA) to demonstrate his UG knowledge.  (Mandernack Aff. ¶ 9.)  The eight-hour UGSA is designed to assess the UG skills of any prospective UG designer, not just experienced engineers.  (*Id.* at ¶ 9.)  The USGA is not designed as a test and does not result in an objective score.  Rather, it is an assessment of an individual's proficiency in UG.  (Def.'s Ex. 32, Hill Aff. ¶ 3.)  It is administered as a closed book, closed notes assessment.  (Hill Aff. ¶ 4.)

8

Ms. Piziali arranged to have Plaintiff take the USGA at another facility to insure the objectivity of the trainer conducting the assessment. Keith Hill administered the USGA to Plaintiff. (Mandernack Aff. ¶ 9.) Keith Hill has been a certified Unigraphics instructor since 1997. (Hill Aff. ¶ 2.) Mr. Mandernack and Julie Piziali met with Keith Hill immediately after the USGA was administered, and he informed them that Plaintiff had not successfully completed the USGA. Plaintiff failed to complete the USGA in the allotted eight hours, failed to design all the components in the assessment, and failed to assemble the components. Plaintiff also asked numerous basic questions about UG during the USGA and demonstrated a level of UG knowledge well below that of other CGITs who had completed at least one UG training course. (Hill Aff. ¶ 5.) Mr. Hill determined that Plaintiff lacked the basic knowledge and skills necessary to continue in the CGIT Program. (Hill Aff. ¶ 6.)

Plaintiff testified that after the exam, he asked to see the score, but Mr. Hill did not show it to him. (Pl.'s Dep. at 335, 400.)

Mr. Mandernack informed Plaintiff that he did not pass, and Ms. Piziali informed Plaintiff on August 9, 2001 that his employment with GM was terminated. (Mandernack Aff. ¶ 9.)

### E.  Plaintiff's EEOC Charge

On August 27, 2001, Plaintiff filed with the Michigan Department of Civil Rights ("MDCR") a complaint and an EEOC charge alleging that he was terminated because of his race. (Def.'s Ex. 16.) GM filed a position statement denying Plaintiff's allegations. (Def.'s Ex. 17.)

After an investigation, the MDCR concluded that "[t]he investigation did not disclose evidence of racial discrimination by [GM] against the claimant."  (Def.'s Ex. 19, MDCR 3/17/03 dismissal recommendation at 3.)  It observed that, "[b]etween February 1, 2001, and August 1, 2001, fifty-four people have joined [GM]'s CGIT program.  Of these fifty-four, forty-six are White, four are Black, including the claimant, three are Asian, and one is Hispanic."  (*Id.* at 4.)  "The claimant is the only one out of fifty-four individuals who failed the training course and was not certified and who was subsequently released from his employment."  (*Id.*)  It concluded that "the claimant's highly personal interpretation of conversations and procedures engaged in by the respondent by any reasonable objective standard do not rise  to the level of empirical evidence of discrimination on which to base a charge of discrimination against [GM]. . . .  The evidence suggests the claimant was the recipient of considerable largesse from the respondent through its documented efforts to assist the claimant in the successful completion of his training."  (*Id.*)

The only contact information the EEOC and MDCR had for Plaintiff was the post office box that he had used in his original complaint.  (Def.'s Ex. 18.)  Both the MDCR and EEOC sent letters to Plaintiff on January 22, 2003.  The MDCR letter notified Plaintiff that his current physical address, not a post office box, and current phone number and secondary phone number were needed.  (Def.'s Ex. 21.)  There is no evidence that Plaintiff complied with this request in writing.

On March 17, 2003, the MDCR mailed to Plaintiff, at the post office box address, a Notice of Disposition and Order of Dismissal informing him that his complaint was being dismissed for insufficient evidence.  (Def.'s Ex. 22.)

On May 13, 2003, the EEOC dismissed Plaintiff's EEOC charge and mailed the Dismissal and Right to Sue letter to him at his post office box address in Warren, Michigan. (Def.'s Ex. 23.)  The "Notice of Suit" provision informed Plaintiff that any lawsuit based on this charge must be filled within 90 days of his receipt of the notice.  (*Id.*)

On May 11, 2004, the EEOC sent Plaintiff a letter (to a different post office box in Rolia, Missouri), acknowledging his statement that he never received the May 13, 2003 Dismissal and Notice of Rights, and enclosing a copy of it and a copy of the certified mail receipt.  (Def.'s Ex. 24.)

On July 15, 2004, Plaintiff filed this action, alleging race discrimination in violation of Michigan's ELCRA and Title VII.  (Def.'s Ex. 25.)

## II.    Standard for Summary Judgment

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In

evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

This matter is presently before the Court on GM's motion for summary judgment. GM raises both procedural and substantive reasons why Plaintiff's race discrimination claims should be dismissed. The Court first addresses the procedural arguments.

### A.  Whether Title VII Claim is Time Barred

Title VII race discrimination claims are time barred if not filed within 90 days from the date the plaintiff has notice of the Right-to-Sue letter ("RTS") from the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1); *Peete v. Am. Standard Graphic*, 885 F.2d 331, 331-32 (6th Cir. 1989). As observed by the Sixth Circuit, "the ninety-day filing requirement of 42 U.S.C. § 2000e-5(f)(1) is *not* a jurisdictional requirement but, instead, is a timing requirement similar to a statute of limitations, subject to waiver, estoppel and equitable tolling." *Truitt v. County of Wayne*, 148 F.3d 644, 646-47 (6th Cir. 1998). The Sixth Circuit has further observed that:

> notice is *given*, and hence the ninety-day limitations term begins running, on the fifth day following the EEOC's mailing of an RTS notification <u>to the claimant's record residential address</u>, by virtue of a presumption of actual delivery and receipt within that five-day duration, unless the plaintiff rebuts

12

that presumption with proof that he or she did not *receive* notification within
that period.

*Graham-Humphreys v. Memphis Brooks Museum of Art*, 209 F.3d 552, 557 (6th Cir. 2000)
(emphasis added).

An EEOC claimant, like Plaintiff, has a duty to notify the EEOC of a change of
address.  *Hunter v. Stephenson Roofing, Inc.*, 790 F.2d 472, 474-75 (6th Cir. 1986)
(concluding that "[t]his burden on claimants is a minimal one and reasonable.").  If the
claimant fails to do so, the ninety-day time period cannot be tolled.  *Id.*

Despite GM's claim to the contrary, there is deposition testimony that supports
Plaintiff's claim that he notified the EEOC that he changed his address.  Plaintiff testified
that he did not recall when he closed the post office box in Warren, Michigan and whether
he provided a forwarding address.  (Pl.'s Dep. at 459-61.)  Likewise, Plaintiff could not
recall if sent the EEOC written notice of his change of address, and there is no record of
any such written notice in his EEOC file.  Nonetheless, Plaintiff insisted at his deposition
that he notified the EEOC of his address change verbally in a phone conversation.  (Pl.'s
Dep. at 463-67.)  This is enough to rebut the presumption that Plaintiff received the RTS
letter within the five days of its May 13, 2003 mailing date.

Because Plaintiff presents evidence that he first received his RTS letter on May 11,
2004, and filed this lawsuit on July 15, 2004, GM is not entitled to summary judgment
based on its argument that Plaintiff's Title VII race discrimination claims are time-barred.
The Court now addresses GM's second procedural argument.

**B.  Whether Certain of Plaintiff's ELCRA Claims are Time-Barred**

Plaintiff alleges that GM discriminated against him because of his race when it: (1) wrongly denied him the opportunity to take a final exam and complete the three-week UG course; (2) refused to give him UG certification after successfully passing the "final exam" in the six-week UG course; and (3) forced him to take an 8-hour closed book, closed note USGA when no other CGIT trainee was required to do so. (Resp. at 2-3; Pl.'s Dep. at 400.) Plaintiff's complaint further alleges that GM discriminated against him on the basis of his race by failing to allow him to complete the UG training required of all CGIT employees, while others in the CGIT program were allowed to complete the training. (Compl. ¶ 7.)

Under Michigan law, a plaintiff must file an ELCRA claim within three years from the date his cause of action accrued. There is no continuing violation doctrine. Thus, any evidence of alleged discriminatory conduct outside the three-year statute of limitations cannot be considered in a discrimination suit brought under the ELCRA. *Garg v. Macomb County Community Mental Health Services*, 696 N.W.2d 646, 659 (Mich. 2005). In light of the holding in *Garg*, GM argues that any allegedly discriminatory conduct occurring before July 15, 2001 that gives rise to Plaintiff's ELCRA claims is time-barred and cannot be considered. This Court agrees.

As the Michigan Supreme Court observed in *Garg*, "'three years' means three years. An employee is not permitted to bring a lawsuit for employment acts that accrue beyond this period." *Id.* Accordingly, Plaintiff's ELCRA claims based on allegations that he was discriminated against during the three-week and six-week UG courses because UG instructors did not answer his questions, failed to provide him with certain manuals, and refused to provide him with UG certification at the end of those courses are time-barred. Each of these incidents of alleged race discrimination supposedly occurred during the first

two UG courses; i.e., sometime between April 2, 2001 through June 29, 2001.  (Islong Dep. at 277-235, 255-62, 282-328, 344-51, 366-68.)

The only portion of Plaintiff's ELCRA race discrimination claim that falls within the three-year statute of limitations is his assertion that he was forced to take the Unigraphics Skills Assessment (UGSA) while similarly situated CGIT employees of other races and/or national origins were not forced to pass an allegedly more difficult closed book, closed note UGSA.  (Compl. ¶¶ 8, 9; Islong Dep. at 373-74, 396, 398.)  The Court will now examine GM's substantive arguments concerning this remaining ELCRA claim along with each of Plaintiff's Title VII claims.

## C.  Plaintiff's Race Discrimination Claims

Claims of race discrimination brought pursuant to Michigan's ELCRA are analyzed under the same evidentiary framework as similar claims brought under Title VII.  *Jackson v. Quantex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).  To establish a *prima facie* case of employment discrimination under Title VII, the plaintiff must show that (1) he is a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position at issue, and (4) he was treated differently than similarly situated employees outside his protected class.  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 470 (6th Cir. 2004).  Defendant GM argues that Plaintiff has not established the third and fourth elements of his *prima facie* case.

### 1.  Qualified for the Position at Issue

GM first argues that Plaintiff has not presented evidence showing that he was qualified to remain in its CGIT Program.  This Court agrees.

To show that he was qualified, Plaintiff must show that he was performing at a level that met GM's legitimate expectations. *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999). GM presents evidence that, to be eligible to continue in its CGIT Program, it expected its CGIT Program trainees to be proficient and certified in Unigraphics. Plaintiff admits that he was aware that if he failed to become Unigraphics certified, he may be asked to leave the CGIT Program. (Islong Dep. at 165.) After the three-week UG course, Plaintiff also signed an April 26, 2001 letter reiterating that "[i]t is the standard protocol for all College Graduates in Training, which is the program you belong, to be Unigraphics Certified as a condition of continued employment." (Def.'s Ex. 12, 4/26/01 letter.) This April 26, 2001 letter also documented that: 1) it had been brought to GM's attention that Plaintiff was "deficient in some of the basic computer skills needed to become Unigraphics Certified"; 2) GM had decided to give Plaintiff "the opportunity to take an additional six-week Basic Unigraphics course", and 3) if Plaintiff decided not to take this opportunity or did take the six-week UG course and failed to successfully complete it, his "employment status" with GM was to be re-evaluated. (*Id.*)

The unanimous assessment of GM's Unigraphics instructors was that Plaintiff failed to demonstrate the level of Unigraphics proficiency required to continue in the CGIT Program. (Payne Aff., Jacob Aff., Korzeniewski Aff., Hill Aff.) Plaintiff does not come forward with evidence refuting GM's evidence that it bases decisions about a trainee's Unigraphics proficiency and certification on an instructor's observations of the trainee's performance during the three- or six-week UG course or during the eight-hour UGSA rather than any specific "test" result. (*Id.*; Ex. 12, 4/26/01 letter; Lange Aff.; Mandernack Aff.; Ex. 14, 7/17/01 e-mail.) Plaintiff has not come forward with evidence showing that he met GM's

expectations or that GM's expectations were not legitimate. *Jacklyn*, 176 F.3d at 929. Plaintiff's subjective belief that he was sufficiently proficient in Unigraphics to be certified is not enough.

**2. Treatment of Other Similarly-Situated CGIT Program Employees**

Plaintiff also fails to establish another element of his *prima facie* case of intentional race discrimination.  He presents no evidence showing that similarly situated CGIT Program employees outside the protected class were treated more favorably than him. Specifically, he presents no evidence that any such employees obtained UG certification despite their instructors' unanimous opinion that they lacked the requisite UG proficiency skills.  He presents no evidence that any such CGIT Program employee, deemed by his UG instructors to lack the requisite UG proficiency, was then certified without being required to take the eight-hour Unigraphics Skills Assessment (UGSA) as was Plaintiff.

"In determining whether an allegedly comparable employee is similarly situated to the plaintiff, the question is whether all of the *relevant* aspects of his employment situation were nearly identical to those of the [plaintiff]'s employment situation." *Id.* (internal quotations and citations omitted).  The only evidence presented on this issue is that presented by GM. (Def.'s Ex. 19, MDCR 3/17/03 dismissal recommendation.)

The MDCR's March 17, 2003 recommendation that Plaintiff's EEOC and MDCR complaint be dismissed observed that, between February 1, 2001 and August 1, 2001, GM had 54 people in its CGIT Program.  Of those 54, 46 were White, 4 were Black (including Plaintiff), 3 were Asian, and 1 was Hispanic.  Plaintiff was the only one out of the 54 who failed to obtain UG certification and was thus terminated from the CGIT Program.  (Def.'s Ex. 19, MDCR 3/17/03 dismissal recommendation at 4.)  After examining the evidence

presented by Plaintiff and GM, the MDCR concluded that, rather than empirical evidence of race discrimination by GM, "[t]he evidence suggests [Plaintiff] was the recipient of considerable largesse from the respondent through its documented efforts to assist [Plaintiff] in the successful completion of his training." *Id.*

Similarly here, Plaintiff presents no evidence from which a reasonable juror could conclude that he was treated less favorably than other similarly situated CGIT Program trainees outside his protected class.

### 3.   Legitimate, Non-Discriminatory Reasons and Pretext

Even if Plaintiff had established a *prima facie* case of race discrimination, GM argues that it would nonetheless be entitled to summary judgment.  This is so, GM argues, because Plaintiff has not presented any evidence showing that its legitimate, non-discriminatory business reasons for the challenged employment action was a pretext for intentional race discrimination.

GM has presented evidence supporting the legitimate, non-discriminatory reason given for the employment actions Plaintiff challenges; e.g., that Plaintiff failed to demonstrate that he had the requisite UG proficiency required to remain in GM's CGIT Program and was thus terminated.  Because GM satisfied this burden, Plaintiff is required "to show the existence of evidence sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken" by GM.  *Hazel v. Ford Motor Co.*, 628 N.W.2d 515, 526 (Mich. 2001) (internal quotation and citation omitted). Plaintiff fails to meet that burden here.

"A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action by showing that the proffered reason (1)

has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (internal quotation and citation omitted). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Id.* (internal quotation and citation omitted).

Plaintiff has not presented evidence showing that GM's proffered business reason for its challenged employment action has no basis in fact; i.e., that GM relies on the CGIT Program instructors' assessment of a trainee's overall performance and UG proficiency before certifying the trainee as UG proficient. Likewise, Plaintiff presents no evidence showing that GM's conclusion, that he lacked the requisite UG proficiency, was an insufficient reason to determine he could no longer continue in the CGIT Program. As discussed above, each of Plaintiff's UG instructors agreed that he lacked the requisite UG proficiency for certification. It is undisputed that UG certification is required for continuation in GM's CGIT Program. Plaintiff's personal belief that GM's assessment of his UG proficiency was wrong is not enough. Plaintiff's "[m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of [race] discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 584 (6th Cir. 2003) (internal quotes and citation omitted). Moreover, as observed by the Michigan Supreme Court, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the

19

employer is wise, shrewd, prudent, or competent." *Hazel*, 628 N.W.2d at 527 (internal quotes and citation omitted).

Plaintiff also fails to present evidence showing that other similarly situated CGIT Program employees outside his protected class were treated more favorably in similar circumstances.  Accordingly, he presents no evidence from which a reasonable jury could infer that racial animus actually motivated GM's challenged conduct.  Contrary to Plaintiff's allegations here, GM gave him every opportunity to succeed.  There is no evidence that his failure to do so was caused by GM's intentional racial discrimination.  Accordingly, GM's motion for summary judgment is granted.

## IV.   Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 10, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 10, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager